Slip Op. 15- 66

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **HUSTEEL COMPANY, LTD.,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES**,<br><br>Defendant,<br><br>and<br><br>**WHEATLAND TUBE COMPANY, and UNITED STATES STEEL CORPORATION**,<br><br>Defendant-intervenors. | **Before: Timothy C. Stanceu, Chief Judge**<br><br>**Consol. Court No. 13-00243** |

## OPINION

[Affirming the final results of an administrative review issued by the International Trade Administration, U.S. Department of Commerce]

Date: June 23, 2015

*Donald B. Cameron* and *Brady W. Mills*, Morris, Manning & Martin, LLP, of Washington, DC, argued for plaintiff and consolidated defendant-intervenor Husteel Co., Ltd. With them on the brief were *Julie C. Mendoza*, *R. Will Planert*, *Mary S. Hodgins*, and *Sarah S. Sprinkle*.

*Daniel L. Schneiderman*, King & Spalding LLP, of Washington, DC, argued for defendant-intervenor and consolidated plaintiff Wheatland Tube Co. With him on the brief were *Gilbert B. Kaplan* and *Joshua M. Snead*.

*Robert E. Lighthizer* and *Jeffrey D. Gerrish*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, for defendant-intervenor and consolidated plaintiff-intervenor United States Steel Corp.

*L. Misha Preheim*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant United States. With him on the briefs were *Claudia Burke*, Assistant Director, *Jeanne E. Davidson*, Director, and *Stuart*

*F. Delery*, Assistant Attorney General.  Of counsel on the briefs were *David W. Richardson*, Senior Counsel, and *Daniel J. Calhoun*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Stanceu, Chief Judge: This consolidated action arose from a final determination (the "Final Results") that the U.S. Department of Commerce ("Commerce" or the "Department") issued in June 2013 to conclude the nineteenth periodic administrative review of an antidumping duty ("AD") order on circular welded non-alloy steel pipe ("subject merchandise") from the Republic of Korea ("Korea").[1]  *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 35,248 (Int'l Trade Admin. June 12, 2013) ("*Final Results*").  The nineteenth review affected entries of subject merchandise made between November 1, 2010 and October 31, 2011 ("period of review" or "POR").  *Id.*

Before the court are two motions for judgment on the agency record pursuant to USCIT Rule 56.2.  Plaintiff Husteel Co., Ltd. ("Husteel"), a Korean producer and exporter of subject merchandise, claims the Final Results are affected by errors that were present in a version of the database of its home market sales that Husteel submitted to Commerce.  Mot. of Pl. Husteel Co., Ltd. for J. upon the Agency R. (Dec. 23, 2013), ECF No. 36 ("Husteel's Mot.").  According to Husteel, Commerce was required, but refused, to issue amended final results based on a corrected version of the home-market-sales database that Husteel had submitted during the review, despite Husteel's bringing the errors to the Department's attention in "ministerial error comments" submitted after publication of the Final Results in accordance with the Department's regulations.  Consolidated plaintiff Wheatland Tube Co. ("Wheatland"), a domestic steel pipe

---

[1] Consolidated under Husteel Co., Ltd. v. United States (Ct. No. 13-00243) is Wheatland Tube Co. v. United States (Ct. No. 13-00249).  Order (Oct. 1, 2013), ECF No. 31.

producer, claims that Commerce unlawfully failed to respond to a notice of supplemental

authority Wheatland filed with Commerce during the administrative review that pertained to the

Department's decision not to apply a "targeted dumping" analysis to Husteel during the review.

Mot. for J. on the Agency R. (Dec. 23, 2013), ECF No. 38 ("Wheatland's Mot.").  Wheatland

also claims that Commerce, when calculating Husteel's margin, failed to correct erroneous

weight conversion factors affecting the comparison between Husteel's home market and U.S.

sales.

     For the reasons discussed in this Opinion, the court denies relief on the claims brought by

Husteel and Wheatland in this action and affirms the Final Results.

## I. BACKGROUND

### A.  The Administrative Proceeding before Commerce

     On December 30, 2011, Commerce initiated the nineteenth administrative review of the

antidumping duty order on circular welded non-alloy steel pipe from Korea.  *Initiation of*

*Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in*

*Part*, 76 Fed. Reg. 82,268 (Int'l Trade Admin. Dec. 30, 2011).  Commerce selected for

individual examination as "mandatory respondents" two Korean exporter/producers of subject

merchandise, Husteel and Hyundai HYSCO ("HYSCO").[2]  *Circular Welded Non-Alloy Steel*

*Pipe From the Republic of Korea: Preliminary Results of Antidumping Duty Administrative*

*Review; 2010-2011*, 77 Fed. Reg. 73,015, 73,015 (Int'l Trade Admin. Dec. 7, 2012) ("*Prelim.*

---

[2] Commerce initiated reviews of seven other Korean exporters/producers but rescinded
the review as to these seven other exporter/producers in the preliminary results of the
administrative review.  *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea:*
*Preliminary Results of Antidumping Duty Administrative Review; 2010-2011*, 77 Fed.
Reg. 73,015, 73,015 (Int'l Trade Admin. Dec. 7, 2012).

*Results*"); *Resp't Selection Mem.* 1 (Jan. 31, 2012) (Public Admin.R.Doc. No. 22) (*Resp't Selection Mem.*).

Commerce issued the preliminary results of the review ("Preliminary Results") on December 7, 2012, preliminarily assigning dumping margins of 6.54% to Husteel and zero to HYSCO. *Prelim. Results*, 77 Fed. Reg. at 73,016; *Prelim. Decision Mem. for the Admin. Review of the Antidumping Duty Order on Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, A-580-809, ARP 10-11, at 2 (Dec. 3, 2012) (Public Admin.R.Doc. No. 135), *available at* http://enforcement.trade.gov/frn/summary/KOREA-SOUTH/2012-29635-1.pdf (last visited June 17, 2015) ("*Prelim. Decision Mem.*").

In the Final Results, published on June 12, 2013, Commerce assigned margins of 3.99% to Husteel and 0.80% to HYSCO. *Final Results*, 78 Fed. Reg. at 35,249. On the same day, Husteel filed its ministerial error comments, alleging that Commerce erroneously failed to use a revised database on Husteel's home market sales that Husteel had submitted as an attachment to its Third Supplemental Questionnaire Response. *Certain Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Ministerial Error Comments* (June 12, 2013), ECF No. 41-19 (Public Admin.R.Doc. No. 189) ("*Husteel's Ministerial Error Comments*"). U.S. Steel Corp. filed rebuttal comments, arguing that Commerce should not amend the Final Results. *U.S. Steel Corp. Rebuttal Ministerial Error Comments* (June 17, 2013) (Public Admin.R.Doc. No. 205). Commerce issued a response to Husteel's ministerial error comments on June 26, 2013, concluding that no amendment to the Final Results was warranted. *Antidumping Duty Admin. Review of Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Ministerial Error Comments Regarding Husteel Co., Ltd.* (June 26, 2013) (Public Admin.R.Doc. No. 207) ("*Dep't's Ministerial Error Resp.*").

### B.  Procedural History before the Court

Husteel initiated this action challenging the Final Results by filing a summons and a

complaint on July 8, 2013.  Summons, ECF No. 1; Compl., ECF No. 6.  Wheatland, a petitioner

in the administrative review, initiated a separate action challenging the Final Results by filing a

summons on July 11, 2013 and a complaint on August 7, 2013.  Summons, ECF No. 1 (Ct.

No. 13-00249); Compl. ¶¶ 2, 4, ECF No. 10 (Ct. No. 13-00249); *Resp't Selection Mem.* 1.

On August 22, 2013, the court granted a consent motion by United States Steel Corp.

("U.S. Steel Corp."), a domestic steel pipe producer and petitioner in the administrative review,

to intervene as a plaintiff in Wheatland's action.  Consent Mot. to Intervene as of Right as

Pl.-Intervenor ¶ 2, ECF No. 15 (Court No. 13-00249); Order, ECF No. 21 (Court No. 13-00249)

(granting motion); *Resp't Selection Mem.* 1.  The court granted consent motions by Wheatland

and U.S. Steel Corp. to intervene as defendants in Husteel's action.  Order (July 12, 2013), ECF

No. 18; Order (Aug. 6, 2013), ECF No. 24.  The court also granted a consent motion by Husteel

to intervene as a defendant in Wheatland's action.  Order (Aug. 22, 2013), ECF No. 20 (Ct.

No. 13-00249).

Husteel and Wheatland filed their motions for judgment on the agency record on

December 23, 2013.  Husteel's Mot. 1; Br. of Pl. Husteel Co., Ltd. in Supp. of its Mot. for J.

upon the Agency R., ECF No. 36-1 ("Husteel's Br."); Wheatland's Mot. 1; Rule 56.2 Br. of

Wheatland Tube Co. in Supp. of its Mot. for J. on the Agency R., ECF No. 38-1 ("Wheatland's

Br.").  Husteel and Wheatland filed responses opposing each other's motions.  Resp. Br. of Pl.

Husteel Co., Ltd. in Opp'n to Def.-Intervenor Wheatland Tube Co.'s Mot. for J. upon the

Agency R. (Apr. 29, 2014), ECF No. 50; Resp. Br. of Wheatland Tube Co. in Opp'n to Husteel

Co., Ltd.'s Mot. for J. on the Agency R. (Apr. 29, 2014), ECF No. 54.  Defendant United States

opposed both motions.  Def.'s Resp. to Pls.' R. 56.2 Mots. for J. (Apr. 29, 2014), ECF No. 52.

Husteel and Wheatland each filed a reply.  Reply Br. of Pl. Husteel Co., Ltd. in Supp. of its Mot.

for J. upon the Agency R. (June 24, 2014), ECF No. 63; Reply Br. of Wheatland Tube Co. in

Supp. of its Mot. for J. on the Agency R. (June 24, 2014), ECF No. 64.  Since intervening in this

action, U.S. Steel Corp. has filed no motions or replies.

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Court Act

of 1980, 28 U.S.C. § 1581(c), under which the U.S. Court of International Trade is granted

exclusive jurisdiction over actions brought under section 516A of the Tariff Act of 1930 ("Tariff

Act"), 19 U.S.C. § 1516a.[3]  In reviewing the Department's decisions in antidumping reviews, the

court will hold unlawful determinations that are "unsupported by substantial evidence on the

record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  In deciding

whether Commerce has acted lawfully, the court must examine the whole of the record and

evaluate "whether the evidence and reasonable inferences from the record support" the

Department's findings.  *Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1520 (Fed. Cir. 1993)

(internal quotation marks and citation omitted).

### B.  Husteel's Challenge to the Rejection of the Ministerial Error Comments

Husteel's claim, in essence, is that: (1) the Final Results erroneously overstated Husteel's

antidumping duty margin because Commerce used an uncorrected database that Husteel

submitted on November 16, 2012 to report the sales of its merchandise in its home market; and

_____

[3] Unless otherwise noted, all statutory citations that follow are to the 2012 edition of the
United States Code and all citations to regulations are to the 2012 edition of the Code of Federal
Regulations.

(2) following Husteel's submission of ministerial error comments on June 12, 2013, Commerce

should have issued amended final results assigning Husteel a margin based on a corrected home

market database that Husteel submitted to Commerce on January 9, 2013 as a substitute for the

November 16, 2012 database.  Husteel maintains that its margin would have been reduced from

the 3.99% rate in the Final Results to a rate below 1% had Commerce used the corrected

database.  Husteel's Br. 7 n.2.

        In its written decision of June 26, 2013, Commerce rejected the ministerial error

comments on various grounds without deciding whether the Final Results actually were affected

by errors as Husteel alleged.  *Dep't's Ministerial Error Resp.* 1, 3.  Among those grounds were

that Husteel, during the review, failed to bring the alleged ministerial error to the Department's

attention in accordance with the Department's regulations and otherwise failed to do so in a way

that reasonably gave Commerce notice of the alleged problem.  *Id.* at 3.  The court denies relief

on Husteel's claim because, as discussed below, Commerce acted within its discretion in

refusing to issue amended final results in response to Husteel's ministerial error comments.

        In subsection (h) of section 1675 of title 19, United States Code, which governs

administrative reviews of antidumping duty orders, Commerce is directed to "establish

procedures for the correction of ministerial errors in final determinations within a reasonable

time after the determinations are issued under this section."  19 U.S.C. § 1675(h).  The statute

provides that "[s]uch procedures shall ensure opportunity for interested parties to present their

views regarding any such errors" and further provides that "the term 'ministerial error' includes

errors in addition, subtraction, or other arithmetic function, clerical errors resulting from

inaccurate copying, duplication, or the like, and any other type of unintentional error which

[Commerce] considers ministerial."  *Id.*

To implement § 1675(h), Commerce has promulgated regulations under which it makes "disclosures" of "the details of its antidumping and countervailing duty calculations," 19 C.F.R. § 351.224(a), including its calculations for preliminary and final results of an administrative review of an antidumping duty order, *id*. § 351.224(b).  In the nineteenth review, Commerce disclosed a "Final Calculation Memorandum" for Husteel that presented the overall margin calculation and attached various, more detailed, documents.[4]  *Final Calculation Mem. for Husteel* (June 5, 2013) (Public Admin.R.Doc. No. 185) (Conf. Admin.R.Doc. No. 130).

According to the Department's regulations, "[a] party to the proceeding to whom the Secretary has disclosed calculations performed in connection with a final determination or the final results of a review may submit comments concerning any ministerial error in such calculations." 19 C.F.R. § 351.224(c).  In the ministerial error comments it filed on June 12, 2013, Husteel stated that it "has identified an error in the Department's Final Results that significantly overstates Husteel's final dumping margin." *Husteel's Ministerial Error*

---

[4] These documents were: *Cost of Prod. & Constructed Value Calculation Adjustments for the Final Results-Husteel* (June 5, 2013) (Public Admin.R.Doc. No. 186) (Conf. Admin.R.Doc. No. 131); *Final Draft Liquidation Instructions* (June 9, 2013) (Public Admin.R.Doc. No. 187) (Conf. Admin.R.Doc. No. 132); *Final Comparison Market Program Log* (June 9, 2013) (Conf. Admin.R.Doc. No. 133); *Final Comparison Market Program Output* (June 9, 2013) (Conf. Admin.R.Doc. No. 134); *Final Margin Program Log* (June 9, 2013) (Conf. Admin.R.Doc. No. 135); *Final Margin Program Output* (June 9, 2013) (Conf. Admin.R.Doc. No. 136); *Final Analysis of Comparison-Market Sales* (June 9, 2013) (Conf. Admin.R.Doc. No. 137); *Final Analysis of U.S. Sales* (June 9, 2013) (Conf. Admin.R.Doc. No. 138).

Commerce also disclosed various documents related to the preliminary calculation of Husteel's margin for the preliminary results of the review: *Prelim. Results of the Antidumping Duty Admin. Review* (Dec. 4, 2012) (Public Admin.R.Doc. No. 134); *Prelim. Decision Mem.* (Dec. 3, 2012) (Public Admin.R.Doc. No. 135); *Prelim. Results Calculation Mem. for Husteel* (Dec. 3, 2012) (Public Admin.R.Doc. No. 136) (Conf. Admin.R.Doc. No. 103); *Cost of Prod. & Constructed Value Calculation Adjustments for the Prelim. Results—Husteel* (Dec. 3, 2012) (Public Admin.R.Doc. No. 137) (Conf. Admin.R.Doc. No. 104); *Prelim. Analysis of Comparison-Market Sales Program Log* (Dec. 5, 2012) (Conf. Admin.R.Doc. No. 106); *Prelim. Analysis of U.S. Sales Program Log* (Dec. 5, 2012) (Conf. Admin.R.Doc. No. 105).

*Comments* 1.  Husteel asserted that "the Final Results are not based on the final home market

sales database ("hsthm04") submitted to the Department on January 9, 2013" and that the alleged

error affected three-digit codes assigned to individual products identified by control number

("CONNUM") in the earlier-submitted database.  *Id*. at 1-2.  Husteel informed Commerce that,

in the course of preparing its January 9, 2013 response to the Department's December 23, 2012

Third Supplemental Questionnaire, "Husteel discovered an error in the three digit code in field

CONNUMH in the home market sales database"—"[s]pecifically, the code reported in the filed

CONNUMH did not correspond to the same products in the U.S. and cost file."  *Id.* at 2 (footnote

omitted).  Husteel added that "[t]he revised database Husteel submitted with the January [9]

Supplemental Response corrected that error."  *Id*.  The significance of the use of the uncorrected

database, according to Husteel's ministerial error comments, is that "[t]he use of the

November 16, 2012 database has resulted in erroneous matches between the home market sales

database and the U.S. sales and cost databases due to the error in the CONNUMH field."  *Id.*

at 3.

       Neither the statute, in 19 U.S.C. § 1675(h), nor the implementing regulations, in

19 C.F.R. § 351.224, require Commerce to take corrective action in response to every ministerial

error allegation.  Nor is Commerce invariably required to take corrective action where a

ministerial error is shown to affect the published decision.  Instead, the statute requires

Commerce to "establish procedures for the correction of ministerial errors in final determinations

within a reasonable time after the determinations are issued."  19 U.S.C. § 1675(h).  Congress

thereby delegated broad rulemaking authority under which Commerce may place reasonable

restrictions on, for example, how and when a party may raise a ministerial error allegation for the

Department's consideration.  Thus, the Department's regulations provide that "[t]he Secretary

will analyze any comments received and, *if appropriate*, correct . . . any ministerial error by

amending the final determination or the final results of review . . . ."  19 C.F.R. § 351.224(e)

(emphasis added).

In § 351.224(c), the Department's regulations governing ministerial error allegations

further provide that "[c]omments concerning ministerial errors made in the preliminary results of

a review should be included in a party's case brief." 19 C.F.R. § 351.224(c).  A related but more

general provision in the Department's regulations, § 351.309(c)(2), addresses the contents of the

case brief, which a party to an administrative review files with Commerce following publication

of the preliminary results of the review.  19 C.F.R. § 351.309(c)(2).  This latter provision directs

that "[t]he case brief must present all arguments that continue in the submitter's view to be

relevant to the Secretary's final determination or final results, including any arguments presented

before the date of publication of the preliminary determination or preliminary results." *Id*.

In ruling on Husteel's ministerial error comments, Commerce concluded, *inter alia*, that

Husteel had waived its argument that Commerce should have used the January 9, 2013 database

in the Final Results instead of the database used for the Preliminary Results, which was the

database Husteel submitted to Commerce on November 16, 2012. *Dep't's Ministerial Error*

*Resp.* 3.  Commerce found that Husteel had failed to raise the issue in its case brief as provided

in 19 C.F.R. § 351.309(c)(2). *Id*.  Based on record evidence, the effect of the Department's

regulations addressing the content of a party's case brief, 19 C.F.R. § 351.309(c)(2) and the

related provision, 19 C.F.R. § 351.224(e), and the way in which Husteel addressed the substitute

database in its January 9, 2013 submission, the court concludes that Commerce acted within its

discretion in refusing to issue amended final results in response to Husteel's ministerial error

comments.

Record evidence supports the finding that Husteel did not raise the home market database

issue in the case brief it filed with Commerce following the Preliminary Results of the review.

Husteel does not dispute this finding but insists that it did not waive any argument or fail to

comply with the Department's regulations.  According to Husteel, "it was only in the *Final*

*Results* that Husteel became aware that Commerce was not using the revised January 9 database

that it submitted in response to Commerce's supplemental questionnaire issued after the

preliminary results."  Husteel's Br. 20.  Husteel asserts that "[p]rior to the *Final Results*, Husteel

had no reason to believe that there was any issue with respect to Commerce['s] using the revised

database in the *Final Results* because Commerce accepted the response and never raised any

issues regarding the timeliness of the submission."  *Id.*  In Husteel's view, the Department's use

of the earlier database in the Preliminary Results was no longer an issue at the time Husteel filed

its case brief (on February 19, 2013), due to Husteel's earlier filing of the corrected database (on

January 9, 2013) and the lack of any response by Commerce in the interim: "Had Commerce

indicated that the January 9 database was untimely submitted new factual information that it was

rejecting at the time it was submitted, then Husteel would have raised the issue in its case brief,

which was filed 40 days after the January 9 supplemental response."  *Id.*

Husteel is correct that Commerce never raised an issue as to the untimeliness of Husteel's

January 9, 2013 submission of the corrected database during the administrative review.  The first

time that Commerce characterized that submission as untimely-submitted new factual

information was in its decision on Husteel's ministerial error comments, which Commerce

issued after publishing the Final Results.[5]  *Dep't's Ministerial Error Resp.* 3.  Nevertheless,

---

[5] The full text of the rationale Commerce provided for its rejection of Husteel's
ministerial error comments is as follows:
(continued…)

Husteel is incorrect in arguing that the pertinent regulations did not require it to identify in its

case brief the issue presented by the Department's use of the earlier database in preparing the

Preliminary Results.

------------------------

(continued…)

       The Department's use of hsthm03 instead of hsthm04 was intential [*sic*] and does not constitute a ministerial error.  Husteel's Januay [*sic*] 9, 2013 responses to the Department's specific questions in the supplemental questionnaire would not have changed the data used to calculate the weighted average dumping margin for Husteel from the preliminary results.  Any other changes made are considered new factual information, and the deadline for the submission of new factual information had passed at the time of this submission and were thus not properly on the record.  We note that the only reference to the other changes was in a footnote to an answer to a question unrelated to those other changes provided by Husteel.  Moreover, the footnote reference inadequately explained what changes were made to the newly submitted database.  In addition, Husteel did not clearly identify the information as new factual information nor request that the Commerce accept the new information after the deadline for submission of factual information has long passed.

       Furthermore, any issues regarding using a new database submitted after the preliminary results should have been included in Husteel's brief.  No arguments were made regarding using a different database than those used in the preliminary results.  Parties are required to address all issues in their administratrive [*sic*] case briefs or they are deemed to have waived them.  19 CFR 351.309(c)(2).  The Courts have held that a party's case brief "must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results."  19 CFR 351.309(c)(2); *see also Dorbest Ltd v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) ("Commerce regulations require the presentation of all issues and arguments in a party's administrative case brief"); *Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327, 1350 (CIT 2010) ("Generally, the 'prescribed remedy' for a party in disagreement with Commerce's Preliminary Results is to file a case brief . . . and that 'case brief must present *all* arguments that *continue* in the submitter's view to be relevant to {Commerce}'s final determination or final results . . . .") (internal citations omitted and emphasis in original).

*Antidumping Duty Admin. Review of Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Ministerial Error Comments Regarding Husteel Co., Ltd.* 3 (June 26, 2013) (Public Admin.R.Doc. No. 207) ("*Dep't's Ministerial Error Resp.*").

Husteel submitted the earlier database to Commerce on November 16, 2012, and

Commerce published the Preliminary Results on December 7, 2012.  Between the dates Husteel

submitted the revised database, on January 9, 2013, and filed its case brief, on

February 19, 2013, Commerce neither acknowledged receipt of the revised database nor notified

Husteel that it would take any action in response.  It was unreasonable for Husteel to presume,

based on nothing more than the Department's silence, that at or before the time Husteel filed its

case brief Commerce already had decided to make the substitution.

Pointing to the Department's regulations, 19 C.F.R. § 351.302(d), Husteel suggests that

Commerce may not retain untimely-filed new factual information on the record unless

Commerce extends the time period for filing.  Husteel's Br. 18.  Husteel argues that during the

review Commerce acted contrary to the regulations in failing to notify the parties that it had

deemed the information untimely and in failing to remove the information from the record.  *Id*.

This argument is not convincing.

Under the Department's regulations, the Secretary may extend filing deadlines to accept

untimely-filed information but "will not consider or retain in the official record of the

proceeding . . . [u]ntimely filed factual information, written argument, or other material that the

Secretary rejects," and the Secretary is directed not to consider or retain "unsolicited

questionnaire responses . . . ."  19 C.F.R. § 351.302(d).  But the court cannot conclude that the

regulations required Commerce, during the time between Husteel's January 9, 2013 submission

of the questionnaire response and Husteel's February 19, 2013 filing of the case brief, to rule on

the question of whether the revised home market database was properly part of the record.

Two considerations guide the court.  First, Husteel submitted the revised database as

unsolicited, non-germane information in response to a questionnaire, a method of submission the

regulations did not permit.  *See* 19 C.F.R. § 351.302(d).  Second, as the record evidence

demonstrates and as Commerce suggested in its written decision rejecting Husteel's ministerial

error comments, Husteel's January 9, 2013 questionnaire response was inadequate to place

Commerce on notice of the need for Commerce to make the substitution Husteel identifies.

*Dep't's Ministerial Error Resp.* 3.

 Husteel provided Commerce the revised database as part of a response to the sixth

question in the Department's Third Supplemental Questionnaire.  That question was as follows:

> Using the information reported in the home market sales file the Department
> calculated the theoretical weight for selected sales.  In several instances where the
> reported nominal pipe size ("NPS") was identical to the reported outside diameter
> ("OD"), the calculated theoretical weight did not match the reported theoretical
> weight.  The following table demonstrates the Department's calculations.  Please
> explain these discrepancies.

*Third Supplemental Questionnaire to Husteel* 3 (Dec. 12, 2012) (Public Admin.R.Doc. No. 144)

("*Third Supplemental Questionnaire*").[6]  Question six sought only an explanation, not the

submission of new or corrected information.  In response, Husteel provided the following

explanation:

> The Department is correct that Husteel mistakenly reported the NPS as the outside
> diameter in these limited instances.  We apologize for the confusion but note that
> it does not affect the margin analysis as the CONNUM and the reported
> theoretical weight for each sale are correct.  The field reporting the outside
> diameter was included for reference only.  Nonetheless, this error has been
> corrected in the revised home market sales database provided in **Exhibit B-25**.[14]
> The following is the calculation of weight for these three transactions using the
> correct outside diameter.

---

[6] The table listed three control numbers ("CONNUMs") for pipe configurations for which
Commerce found discrepancies between calculated and reported theoretical weight.  The table is
not reproduced here because it contains confidential data not necessary to the court's discussion
of this issue.

*Husteel's Third Supplemental Questionnaire Resp.* 11-12 (Jan. 9, 2013) (Public Admin.R.Doc.

No. 153) (bold in original).[7]  Husteel's footnote 14 stated as follows:

> The revised home market database also corrects the reported CONNUMH (the
> three digit code).  Husteel discovered that there were instances in which the
> CONNUMH did not correspond to the same product in the U.S. and cost file.
> There are no changes to the physical characteristics or to the concatenated
> CONNUM code in field CONNUMHI used for matching purposes.

*Id.* at 12 n.14.  The first two sentences in Husteel's response to question six informed Commerce

that the three errors Commerce identified did in fact exist in the reported information but that the

errors had no effect on the margin calculation because the information items necessary to that

calculation (the CONNUM and the reported theoretical weight for the sales in question) were

correct as reported.  From these two sentences Commerce reasonably could conclude that it had

no need to take further action concerning the subject about which it had inquired in question six.

Husteel's explanation in the third sentence, that it had included the outer diameter dimension

"for reference only," *id.* at 11, reinforced this point, and the remainder of the text described

Husteel's submission of corrections to the unnecessary information on outside diameter.  Read in

context, the fourth sentence ("*Nonetheless*, this error has been corrected in the revised home

market sales database provided in **Exhibit B-25)**", *id.* at 11-12 (italic emphasis added, bold in

original), further suggested that the corrections made in the substituted database were

unnecessary to the margin calculation.  For these reasons, and because Husteel's response to

question six was self-explanatory, Commerce justifiably could presume that Husteel's

footnote 14 required no action or response by the Department.  Moreover, Husteel's footnote did

not request that Commerce substitute in the record the revised database included as Exhibit B-25

---

[7] Here also, the table is not reproduced here because it contains confidential data not
necessary to the court's discussion of this issue.

for the version of the database used in the Preliminary Results and did not inform Commerce of

the significance of the corrected information.  In short, neither the text in the body of the

questionnaire response nor the text in the footnote adequately informed Commerce of the need to

substitute the database in order to achieve a correct margin in the final phase of the review.

The court considers the Department's regulations sufficient to instruct a party not to wait

until receiving the final calculation memoranda before bringing to the Department's attention an

error affecting the preliminary results of the proceeding.  In the situation this case presents,

Husteel could not preserve the issue of which database Commerce should use in preparing the

Final Results without timely raising that issue.  According to its own statement on the record,

Husteel discovered the error while preparing its response to the Third Supplemental

Questionnaire, i.e., between December 12, 2012 and January 9, 2013.  *Husteel's Ministerial*

*Error Comments* 2.  Not only did Husteel fail to raise the issue in the case brief it filed on

February 19, 2013, it also failed to notify Commerce of the issue, in any other prompt and

reasonable way, at any time before Husteel filed ministerial error comments at the conclusion of

the review.

In support of its Rule 56.2 motion, Husteel argues that Commerce erred in concluding

that the use of the earlier-submitted database in the Final Results was intentional and therefore

not a ministerial error.  Husteel's Br. 13, 19 ("Commerce . . . cannot claim that it 'intentionally'

calculated Husteel's dumping margin in the *Final Results* using the CONNUMH that it was told

by Husteel five-months earlier contained an error."); *see Dep't's Ministerial Error Resp.* 3 ("The

Department's use of hsthm03 instead of hsthm04 was intential [*sic*] and does not constitute a

ministerial error.").  In the context of the entire response to the Husteel's ministerial error

comments, the court construes the Department's statement that the use of the earlier database

was intentional to mean that Commerce considered the error Husteel alleged not to qualify as

"ministerial" within the meaning of 19 U.S.C. § 1675(h) because the alleged error was made by

Husteel, not Commerce, and was not made apparent to the Department during the review.[8]  On

the record of this case, it is unwarranted to construe the statement in question (as Husteel

apparently does) to mean that Commerce, during the review, intentionally used a database it

knew to contain errors.

The Court of Appeals for the Federal Circuit ("Court of Appeals") has opined that an

error existing in information submitted by a party to a proceeding and relied upon by Commerce

potentially could qualify as a "ministerial" error within the meaning of § 1675(h) if the error

was, or should have been, apparent to Commerce.  *Alloy Piping Prods. v. Kanzen Tetsu Sdn.

Bhd.*, 334 F.3d 1284, 1292-93 (Fed. Cir. 2003) ("*Alloy Piping*").  The Department's decision on

Husteel's ministerial error comments indicates to the court that Commerce considered Husteel's

January 9, 2013 response to the Third Supplemental Questionnaire insufficient to make the

alleged errors apparent.  Commerce concluded that "Husteel's January 9, 2013 responses to the

Department's specific questions in the supplemental questionnaire would not have changed the

data used to calculate the weighted-average dumping margin for Husteel from the preliminary

results" and that "the footnote reference inadequately explained what changes were made to the

newly submitted database."  *Dep't's Ministerial Error Resp.* 3.

In addition to concluding that the alleged error was not "ministerial" within the meaning

of the statute or its regulations, Commerce also concluded that Husteel had not raised its

---

[8] The ministerial error response states in its opening summary that "[w]e recommend finding that the alleged error does not constitute a ministerial error under section 751(h) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.224(f)."  *Dep't's Ministerial Error Resp.* 3.

ministerial error allegation in accordance with the regulations.  *Id.*  As the court discussed

previously, Commerce was justified in refusing to act favorably on Husteel's ministerial error

comments because of the improper and unsatisfactory way Husteel brought the allegedly

erroneous CONNUMH entries to the Department's attention.  For this reason, it does not matter

whether Commerce was correct or incorrect in concluding that the error Husteel alleged did not

qualify as "ministerial" under the statute, and the court need not decide that question in order to

rule on Husteel's claim.  Here, it is sufficient for the court to conclude, as it does, that Commerce

acted within its discretion in refusing to issue amended final results in response to Husteel's

ministerial error comments.  Husteel advances several arguments to the contrary, which do not

persuade the court.

Husteel takes issue with the Department's reasoning that the substitute database Husteel

submitted on January 9, 2013 was untimely-submitted new factual information.  Husteel's

Br. 14.  Husteel argues that "[u]nder the facts of this case, Commerce's belated claim of

untimeliness is nothing more than a *post-hoc* justification for its failure to use the final revised

database that is not supported by the record or the law."  *Id.*  Specifically, Husteel submits that

". . . the record provides no support for Commerce's claim that the failure to use the January 9

database was intentional, let alone that Commerce had determined that submission contained

untimely new factual information."  *Id.*  The court does not find merit in this argument.

Although Commerce stated, in its response to Husteel's ministerial error comments, a conclusion

that the January 9, 2013 submission of the substitute database constituted untimely-submitted

new factual information, Commerce did not say it had reached that conclusion previously, i.e.,

during the review, and the record does not support an inference that Commerce did so.  Stating

its conclusion of untimeliness in the ministerial error response, Commerce found that Husteel

neither identified the revised database clearly in its January 9, 2013 submission as new

information nor requested that Commerce accept that database for the record despite expiration

of the time for submission of new factual information.  *Dep't's Ministerial Error Resp.* 3.  The

text of Husteel's response to question six of the Third Supplemental Questionnaire, which the

court discussed above, supports the Department's decision.  The inclusion of the revised

database as non-germane information in the questionnaire response was neither permitted by the

regulations nor adequately presented to Commerce as a proposed substitution essential to an

accurately determined margin in the final phase of the review.

Husteel further argues that, if Commerce rejected the revised database submitted with the

January 9, 2013 questionnaire response from the administrative record as untimely-filed new

factual information, then Commerce violated its obligation under 19 U.S.C. § 1677m(f) to

provide a written explanation for the rejection, and under 19 U.S.C. § 1677m(d), which required

Commerce, "to the extent practicable", to notify Husteel of any deficiencies in its questionnaire

response.  Husteel's Br. 16-17.  This argument fails because Commerce found no deficiency in

the way Husteel responded to the Department's inquiry in the supplemental questionnaire, which

did not seek resubmission of the database.  *See Third Supplemental Questionnaire* 3 ("In several

instances . . . the calculated theoretical weight did not match the reported theoretical

weight. . . . Please explain these discrepancies."); *Ta Chen Stainless Steel Pipe, Inc. v. United

States*, 298 F.3d 1330, 1338 (Fed. Cir. 2002) (stating that 19 U.S.C. § 1677m "only applies when

a 'response to a request' is deemed to not comply.").  Husteel has not shown that Commerce

failed to meet an obligation arising from § 1677m(d) or § 1677m(f).

Husteel notes that Commerce stated in the issues and decision memorandum

accompanying the Final Results (the "Decision Memorandum") that Husteel's response to the

supplemental questionnaire had been timely submitted.  Husteel argues that the Department's

statement in Decision Memorandum contradicts the Department's reasoning that the

January 9, 2013 database was untimely-filed new information.  Husteel's Br. 15-16 (citing *Issues*

*& Decision Mem. for the 2010-2011 Admin. Review of Circular Welded Non-Alloy Steel Pipe*

*from the Republic of Korea*, A-570-904, ARP 10-11, at 2 (June 5, 2013) (Public Admin.R.Doc.

No. 208), *available at* http://enforcement.trade.gov/frn/summary/korea-south/2013-13989-1.pdf

(last visited June 17, 2015)) ("*Final Decision Mem.*").  This view is incorrect.  Contrary to

Husteel's characterization, the Department found timely the questionnaire response, not the

non-germane corrections in the revised database.  *See Final Decision Mem.* 2.

Husteel argues that Commerce was required to use the corrected database, citing *Alloy*

*Piping*, 334 F.3d at 1292-93.  Husteel's Br. 19.  Relying on *Borlem S.A.-Empreedimentos*

*Industriais v. United States*, 913 F.2d 933, 937 (Fed. Cir. 1990) ("*Borlem*"), Husteel also argues

that the court should not defer to a decision made by an administrative agency based on incorrect

data.  *Id.* at 19-20.  Considering a situation in which an error was present in information reported

to Commerce, the Court of Appeals opined in *Alloy Piping* that "in some instances, a

respondent's error will be apparent from the face of Commerce's own final decision or from the

calculations underlying that decision."  *Alloy Piping*, 334 F.3d at 1292.  In such circumstances

the "error, in effect, becomes a government error and, hence, a 'ministerial' error, and the

government is required to correct it."  *Id.* at 1293.  In *Alloy Piping*, the Court of Appeals held

that such a situation did not exist, concluding that the error in question was not apparent to

Commerce during the administrative proceeding.  *Id.*  As discussed earlier in this Opinion, the

court does not reach the question of whether the alleged error was, or was not, sufficiently

apparent to qualify as a ministerial error under 19 U.S.C. § 1675(h) because Commerce, in either

event, did not exceed its discretion in refusing to issue amended final results.  As the court also

discussed, Commerce was not properly or adequately informed during the review of the issue

posed by the use of the home market database submitted in November 2012, which alone was a

sufficient ground for the Department's decision not to act favorably on Husteel's ministerial

error comments.  *Alloy Piping*, therefore, does not establish a principle under which Husteel

qualifies for a remedy on its ministerial error claim.  Husteel's reliance on *Borlem* is also

misplaced.  In *Borlem*, the Court of Appeals considered decisive that the International Trade

Commission reached a final determination in reliance on erroneous data that the Commission

itself generated and acknowledged to be incorrect.  *Borlem*, 913 F.2d at 937.  That situation is

not present in this case.

　　　　Citing certain decisions of this Court and noting that neither Commerce nor the

petitioners objected to the submission of the revised database during the review, Husteel argues

that it was not until filing its ministerial error comments that it had a full and fair opportunity to

raise the issue addressed in the ministerial error comments.  Husteel's Br. 21-23 (citing *Calgon

Carbon Corp. v. United States*, 35 CIT __, __, Slip Op. 11-0021 at *11 (Feb. 17, 2011); *LTV

Steel Co. v. United States*, 21 CIT 838, 868-69; 985 F. Supp. 95, 120 (1997); *Qingdao Taifa

Group Co. v. United States*, 33 CIT 1090, 1093, 637 F. Supp. 2d 1231, 1237 (2009); *Saha Thai

Steel Pipe Co. v. United States*, 17 CIT 727, 729-30, 828 F. Supp. 57, 59-60 (1993)).  But by no

later than January 9, 2013, Husteel was aware of the issue posed by the Department's use of the

November 16, 2012 database in the Preliminary Results.  Husteel, therefore, had a full and fair

opportunity to raise the issue, either in its case brief, which is the method of informing

Commerce required by the regulations in such a circumstance, or in some other way that

Commerce arguably could have found to suffice.

Citing *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1348 (Fed. Cir. 2006)

("*Timken U.S.*"), and *NTN Bearing Corp. v. United States,* 74 F.3d 1204 (Fed. Cir. 1995)

("*NTN*"), Husteel also argues that Commerce, failing to satisfy its obligation to calculate

Husteel's margin as accurately as possible, abused its discretion in basing the Final Results on a

database it knew to contain clerical errors.  Husteel's Br. 24.  This argument fails in two respects.

First, as discussed previously, the court does not construe the Department's response to Husteel's

ministerial error comments to mean that Commerce based the Final Results on a database it

knew to contain clerical errors.  Second, these cases are inapposite.  In *NTN* and in *Timken U.S.*,

a respondent alerted Commerce to clerical errors during the review and made Commerce aware

during the review that action on the part of Commerce was necessary to achieve a correct final

result.  *NTN*, 74 F.3d at 1205, 1208; *Timken U.S.*, 434 F.3d at 1347-48.  In such a circumstance,

Commerce may be required to correct an error even though the information necessary to do so

may not have been timely submitted.  In contrast, Husteel's argument relies on its

January 9, 2013 submission and, in particular, the aforementioned footnote 14.  For the reasons

the court has discussed, however, the January 9, 2013 submission did not reasonably place

Commerce on notice of the need to make a correction.

Husteel is correct that, as the Court of Appeals stated in *Rhone Poulenc, Inc. v. United

States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990), Commerce has an overriding obligation to

calculate antidumping duty margins as accurately as possible.  Husteel's Br. 26, 29 (citing *id.*

at 1191).  In some circumstances, that obligation may require Commerce to waive its regulatory

requirements on the timely submission of information.  The difficulty in this case is that Husteel

did not bring the alleged clerical errors to the Department's attention in any reasonable or

permissible way during the review despite having had an adequate opportunity to do so.  In

directing Commerce to establish procedures for the correction of ministerial errors after issuance

of the final results of an investigation or review, Congress established an exception to the general

principle of finality. *See* 19 U.S.C. § 1675(h). In implementing this directive, Commerce placed

reasonable regulations on the time and manner in which a party that is aware of a ministerial or

other error affecting the preliminary results of a review must bring the error to the Department's

attention in order to obtain remedial action. While Commerce has a general obligation to ensure

the most accurate margin possible, it does not follow that a party failing to comply with

regulations may obtain in any circumstance a ministerial error correction after a review is

completed. Here, Husteel did not fulfill its own obligation to act promptly and reasonably to

bring to the Department's attention a matter Husteel believed would affect the accuracy of the

final margin.

Finally, Husteel argues that even absent the January 9, 2013 database, Commerce had a

"readily available alternative" of using certain record information in the November 16, 2012

database, which Husteel had placed on the record prior to the Preliminary Results, to calculate an

accurate margin. Husteel's Br. 29 (arguing that Commerce could have used "the CONNUM1H

for purposes of matching Husteel's home market sales to the CONNUM1U and CONNUM1

reported in the U.S. and cost files, respectively"). This argument seems directed to a claim other

than the one Husteel has brought in this case, which challenges the Department's rejection of

Husteel's ministerial error comment submission. *See* Husteel's Br. 1. Husteel's ministerial error

comment submission alleges as a ministerial error the Department's basing "the final results on

Husteel's database ('hsthm 03') submitted on November 16, 2012" instead of the home market

database (identified in the submission as "hsthm 04") Husteel submitted on January 9, 2013.

*Husteel's Ministerial Error Comments* 2. Husteel's ministerial error comments do not discuss

the alternative Husteel identifies in its argument before the court.  The claim Husteel has placed

before the court requires the court to decide whether or not Commerce exceeded its discretion in

refusing to act on the ministerial error comments Husteel actually submitted.  Husteel's Br. 1.

Concluding that Commerce did not exceed its discretion, the court does not reach the issue of

whether Commerce, had it chosen to do so, could have corrected the alleged clerical errors,

either by using the January 9, 2013 database or through some other method not identified in

Husteel's ministerial error comments.

C.  Wheatland's Challenges to the Final Results

Wheatland challenges two aspects of the Final Results.  First, Wheatland alleges that

during the review Commerce impermissibly failed to respond to a submission that Wheatland

filed to address the issue of "targeted dumping."  Wheatland's Br. 5-6.  Second, Wheatland

contests the Department's decision to adopt certain "weight conversion factors" to convert the

weight of merchandise as recorded in Husteel's cost database to the unit of measurement used to

record weights in Husteel's home-market sales database.  Wheatland's Br. 2.  As discussed

below, the court must reject both of Wheatland's claims and affirm the Department's

determinations.

1.  Wheatland's Claim that Commerce Improperly Failed to Address Wheatland's Notice of
Supplemental Authority

Wheatland claims that Commerce unlawfully issued the Final Results without responding

to a submission Wheatland made to Commerce during the administrative review proceeding.

Wheatland's Br. 5-6.  Wheatland directed that submission, which consisted of a March 18, 2013

letter that Wheatland titled a "Notice of Supplemental Authority," to its allegation that the two

mandatory respondents engaged in "targeted dumping."  *See Notice of Supplemental

Authority* 1-2 (Public Admin.R.Doc. No. 179) ("*Notice of Supplemental Authority*").  In the

submission, Wheatland urged Commerce to apply a new methodology (the "differential pricing"

methodology) to determine whether to calculate the respondents' margins on an

"average-to-transaction" basis rather than according to the ordinary method, which determines a

margin on an "average-to-average" basis.[9] *Id*. at 2.  Wheatland characterized the new

methodology as a "change in the law that occurred after the briefing concluded in this case." *Id*.

at 1.

Without responding to the Notice of Supplemental Authority and without applying the

new differential pricing methodology to which Wheatland referred in its submission, Commerce

---

[9] For antidumping investigations, section 777A(d)(1)(B) of the Tariff Act authorizes Commerce to use the "average-to-transaction" method of comparing normal value to export price or constructed export price where Commerce finds there is a "pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time . . . ," 19 U.S.C. § 1677f-1(d)(1)(B)(i), i.e., "targeted dumping," and if Commerce "explains why such differences cannot be taken into account" using average-to-average or individual-to-individual transaction comparisons, 19 U.S.C. § 1677f-1(d)(1)(B)(ii).

The Department's regulations provide that Commerce ordinarily will determine whether subject merchandise is being sold at less than fair value by comparing the weighted average of normal values of subject merchandise with the weighted average of export prices (or constructed export prices) for comparable merchandise, i.e., the "average-to-average" method.  19 C.F.R. § 351.414(b)(1), (c)(1).  Commerce, however, will compare the weighted average of normal values to export prices (or constructed export prices) of individual transactions for comparable merchandise (the average-to-transaction method) if the "Secretary determines another method is appropriate in a particular case." *Id.* § 351.414(c)(1).  In the Decision Memorandum, Commerce explained that "[a]lthough section 777A(d)(1)(B) of the [Tariff] Act does not strictly govern our examination of this question in the context of an administrative review, we nevertheless find that the issue arising under 19 CFR 351.414(c)(1) in an administrative review is, in fact, analogous to the issue in investigations." *Issues & Decision Mem. for the 2010-2011 Admin. Review of Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, A-570-904, ARP 10-11, at 6 (June 5, 2013) (Public Admin.R.Doc. No. 208), *available at* http://enforcement.trade.gov/frn/summary/korea-south/2013-13989-1.pdf (last visited June 17, 2015)) ("*Final Decision Mem.*").

calculated Husteel's final margin using the usual average-to-average method.[10]  *See Final Decision Mem.* 11-12, 22-23.  Wheatland argues that Commerce overlooked the Notice of Supplemental Authority and unlawfully failed to explain its decision not to apply the new differential pricing methodology in determining Husteel's margin.  Wheatland's Br. 5-6.  Wheatland argues, further, that "[b]ecause Commerce made no factual findings in support of its decision and provided no reasons justifying its decision, that decision is unsupported by substantial record evidence and is not in accordance with law."  *Id.* at 6.  The court rejects Wheatland's arguments.  Wheatland is unable to show either that the development it described in the Notice of Supplemental Authority constituted a change in law or that Commerce was under any obligation to respond specifically to Wheatland's submission.  Moreover, Commerce explained in the Decision Memorandum its decision to determine a margin for Husteel on the average-to-average basis.

The background surrounding Wheatland's filing of the Notice of Supplemental Authority demonstrates the lack of merit in the claim Wheatland bases on that submission.  During the nineteenth administrative review proceeding, Wheatland alleged targeted dumping and argued that Commerce should determine Husteel's and HYSCO's dumping margins using the average-to-transaction method rather than the normal average-to-average method.  *Wheatland Targeted Dumping Allegation* (June 6, 2012) (Public Admin.R.Doc. No. 74).  In the Preliminary Results, Commerce preliminarily determined that it would calculate both respondents' dumping

_____

[10] In the Final Results, Commerce calculated a weighted-average dumping margin for HYSCO using the average-to-transaction method.  *Final Decision Mem.* 23.  Wheatland's challenge on this issue before the court is limited to the Department's calculation of Husteel's dumping margin.  Rule 56.2 Br. of Wheatland Tube Co. in Supp. of its Mot. for J. on the Agency R. 5-6, ECF No. 38-1 ("Wheatland's Br.") ("Commerce overlooked the argument and continued, without explanation, to evaluate 'targeted dumping' by Husteel under the former test used in *Nails from China*.").

margins using the average-to-average method after finding "that the pattern of [constructed

export prices] for comparable merchandise that differ significantly among purchasers, regions or

time periods does not exist for both HYSCO and Husteel . . . ."  *Prelim. Decision Mem.* 5.  In a

case brief responding to the Preliminary Results, submitted on February 19, 2013, Wheatland

objected to the Department's targeted dumping analysis in the Preliminary Results, alleging that

Commerce had not found targeted dumping "because the Department did not conduct its analysis

by state."  *Case Br. of Wheatland Tube Co. re: Husteel Co., Ltd.* 11 (Public Admin.R.Doc.

No. 165) (footnote omitted).

        In its Notice of Supplemental Authority, submitted to Commerce after the case briefs,

Wheatland stated that "[a]s the Department is aware, Wheatland has argued that the Department

should find targeted dumping (based on the then-existing *Nails* test) by the Korean respondents

in this case and apply the alternative 'average-to-transaction' margin calculation

methodology."[11]  *Notice of Supplemental Authority* 1 (footnote omitted).  Wheatland further

stated that "the Department should employ the new standard enunciated in" a March 4, 2013

memorandum (the "*Xanthan Gum*" memorandum) that Commerce issued in a separate

administrative proceeding.  *Id.* at 1-2 (citing *Less Than Fair Value Investigation of Xanthan Gum*

*from the People's Republic of China (A-570-985): Post-Prelim. Analysis & Calculation Mem.*

*for Neimenggu Fufeng Biotechnologies, Co., Ltd. & Shandong Fufeng Fermentation Co., Ltd.*

(Mar. 4, 2013) (IAACCESS #3122156-01)).  Other than characterizing the *Xanthan Gum*

memorandum as establishing a change in controlling law, Wheatland advanced no argument as

---

[11] In its brief before the court, Wheatland cites, with respect to the *Nails* test, *Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 33,977 (Int'l Trade Admin. June 16, 2008).  *See* Wheatland's Br. 6.

to why Commerce must, or should, alter its methodology for identifying targeted dumping in the Final Results.

In the Final Results, Commerce again found an absence of a pattern of sales that indicated targeted dumping for Husteel despite having reassessed the targeted dumping allegation based on the specific U.S. states as urged by Wheatland in its targeted dumping allegation.[12] *Final Decision Mem.* 23.  Commerce decided to continue using the average-to-average method to determine Husteel's dumping margin.  *Id.*  Commerce did not respond to Wheatland's Notice of Supplemental Authority in the Final Results or in the accompanying Decision Memorandum.

Because the *Xanthan Gum* memorandum has not been placed on the administrative record, the court will draw no conclusions from any content therein.  And because the memorandum is not a final agency decision issued in conjunction with published results of an administrative proceeding, it is not a document of which the court will consider taking judicial notice.  At the same time, the fact that the *Xanthan Gum* memorandum is not a final decision of the Department to apply the differential pricing analysis—a fact apparent from the citation to the memorandum in the Notice of Supplemental Authority—also demonstrates that Wheatland may not rely on the *Xanthan Gum* memorandum for its claim that the memorandum established a change in the controlling law obligating Commerce to take action in the nineteenth review.

At oral argument, Wheatland also argued that a remand is appropriate because the Department's lack of response to or formal rejection of the Notice of Supplemental Authority violated the Department's obligation under 19 C.F.R. § 351.302(d)(2) to respond to or formally

---

[12] Commerce did find that such a pattern existed for HYSCO and, as noted above, applied the average-to-transaction method to HYSCO.  *Final Decision Mem.* 23.

reject a submission of untimely argument.  Oral Arg. Tr. 112 (Nov. 3, 2014), ECF No. 78-2.

This argument is not properly before the court because Wheatland did not raise it in its Rule 56.2

brief.  Regardless, the court sees no merit in the argument.  The regulatory provision in question

is addressed to "[u]ntimely filed factual information, written argument, or other material that the

Secretary rejects . . ." and to [u]nsolicited questionnaire responses . . . ."  19 C.F.R.

§ 351.302(d)(1)(i), (ii).  The Notice of Supplemental Authority is not described by any of these

categories.  Wheatland submitted this document (albeit mistakenly) as a notice of a change in

existing law, not as a "written argument" filed with leave for acceptance by Commerce after the

close of the period for the filing of case briefs.  Under the regulation, "*certain* untimely filed or

unsolicited material will be rejected together with an explanation of the reasons for the rejection

of such material."  19 C.F.R. § 351.302(a) (emphasis added).  Commerce, therefore, was not

under the requirement of § 351.302(d)(2) to "reject such information, argument, or other

material . . . with, to the extent practicable, written notice stating the reasons for rejection."

    2.  Wheatland's Claim Challenging the Use of Husteel's Weight Conversion Factors

      Wheatland claims that Commerce, when calculating Husteel's margin, erred in relying on

certain "actual weight to theoretical weight conversion factors" that Husteel provided during the

administrative review for individual products it produced and sold during the POR (identified by

"control number," or "CONNUM").  Wheatland's Br. 2.  Wheatland alleges that these weight

conversion factors were "unreliable and distortive" and argues that Commerce instead should

have used "facts otherwise available," *see* 19 U.S.C. § 1677e, as a substitute for the weight

conversion factors.  *Id*.  Wheatland argues, further, that it appears that Husteel, in providing the

conversion factors, attempted to manipulate its dumping margin.  *Id*. at 7.  The court finds no

merit in Wheatland's claim.

According to Wheatland's argument, the weight conversion factors Husteel provided understated the cost of production for steel pipe Husteel sold in the home market of Korea and thereby reduced Husteel's dumping margin by preventing certain home market sales from being excluded from the home market sales database.[13]  *Id*.

In deciding to use the conversion factors over objections Wheatland made during the review, Commerce reached several findings based on evidence in the administrative record. Wheatland advances a general argument that Commerce failed to address these objections adequately and failed to "support its decision with record evidence."  *Id*. at 6-7.  Contrary to Wheatland's argument, the court concludes that the record evidence supports the specific findings upon which Commerce concluded that the conversion factors were not distortive.

Commerce found that quantities in Husteel's home market sales database were recorded in units of "theoretical" metric tons while quantities reported in Husteel's cost-of-production database were recorded in units of "actual" metric tons.[14]  *Final Decision Mem.* 35-36. Commerce concluded that "a comparison of the sales and cost figures unadjusted for these differences would not provide for a meaningful or accurate analysis" and that "the sales and cost

---

[13] In determining a dumping margin, Commerce compares the export price (or constructed export price) of the sale of the subject merchandise with the normal value of that merchandise, which ordinarily is determined according to the price of the foreign like product when sold in a respondent's comparison market (in this case, the home market of Korea). 19 U.S.C. §§ 1675(a)(2)(A), 1677b(a)(1)(B).  In certain circumstances, Commerce, when determining normal value, may disregard comparison market sales of foreign like products that were made below the cost of production.  19 U.S.C. §§ 1677b(b)(1), (c)(2)(D).

[14] Husteel derived the actual weights by weighing a sample unfinished pipe and subtracting the weight of scrap removed during Husteel's finishing process.  *See* Resp. Br. of Pl. Husteel Co., Ltd. in Opp'n to Def.-Intervenor Wheatland Tube Co.'s Mot. for J. upon the Agency R. 4-5 (Apr. 29, 2014), ECF. No. 50; *Husteel Resp. to Third Supplementary Questionnaire* 7-8 (Jan. 9, 2013) (Public Admin.R.Doc. No. 153).  Husteel calculated "theoretical" weights according to an industry standard formula.  *Final Decision Mem.* 35.

data must be stated on a consistent basis of measurement." *Id.* at 35.  Commerce concluded,

further, that "the record evidence supports the continued use of the reported conversion factors to

accommodate the comparison of Husteel's sales and cost data on a comparable basis." *Id*.  The

court has considered, and affirms, the specific findings upon which Commerce reached those

conclusions.

As a threshold consideration, Commerce noted that Husteel's sales files were based on

theoretical metric tons determined according to a formula Husteel described as an industry

standard formula.[15]  *Id*.  Wheatland did not contest this fact or the theoretical weight formula

before Commerce, nor does Wheatland do so before the court.

As to the cost data, Commerce found that "Husteel describes a system whereby the actual

quantities reflect the actual measured weight of the input hot-rolled coil less the scrap generated

during production." *Id*. at 36 (footnote omitted).  Commerce added that "Husteel weighs

samples of each type of pipe from each production run" and that "[t]he extension of the sample

weights and number of pipes produced is compared to the input hot-rolled coil less scrap weight

and any significant differences result in an adjustment in the recorded 'actual' weight." *Id*.

(footnote omitted).  Commerce also found that Husteel itself relied on the "actual weights"

determined according to this method for the cost accounting system by which it allocated costs to

products. *Id*.  Wheatland does not specifically contest any of the Department's findings related

to Husteel's method of determining "actual" weights as recorded in Husteel's books and records.

Commerce next found that, based on the record evidence, "the pipe weights reported to

the Department were taken directly from Husteel's normal production and cost accounting

---

[15] That formula is: (outside diameter less theoretical wall thickness) * theoretical wall
thickness * 0.02466 [density factor]* length/1000. *Final Decision Mem.* 35; Def.'s Resp. to Pls.'
Rule 56.2 Mot's for J. 8 (Apr. 29, 2014), ECF No. 52.

records." *Id*.  Upon tracing the reported costs and quantities for selected products to Husteel's

production and cost accounting records, Commerce found "no evidence to support that the actual

weights reported to the Department were manipulated in order to shift costs between products"

and "no inconsistencies in the manner in which the product weights were determined or in how

costs were allocated between products." *Id*.  Finally, Commerce found "no evidence to suggest

that the company's normal books and records were manipulated to shift costs between products

for the purpose of reporting to the Department." *Id*.

        Commerce next considered Husteel's conversion factor formula, which Commerce

described as "a ratio of the actual to theoretical POR production run weights for each

CONNUM." *Id*. at 37 (footnote omitted).  Commerce explained that Husteel had originally

submitted a conversion factor formula with a numerator that "approximated but did not match

the per-actual weight costs it was intended to convert" but that the conversion factors used in the

Final Results have "a numerator that reflects the actual production run quantities used to

calculate the per-unit costs and a denominator that reflects the theoretical quantities for those

production runs."[16] *Id*. (footnotes omitted).  Commerce found that the theoretical quantities in

the denominator of the formula "were calculated using the same formula that was used to

calculate theoretical quantities in the sales files." *Id*.  In support of its conclusion that "the

record evidence supports the continued use of the reported conversion factors to accommodate

---

        [16] On October 24, 2012, Commerce issued a supplemental questionnaire to Husteel
noting inconsistencies in the conversion factors that Husteel had provided in an initial
questionnaire response and requesting an explanation.  *See Second Supplemental Questionnaire
to Husteel* 4 (Public Admin.R.Doc. No. 116).  In response to this questionnaire and after
consultation with Commerce on November 8, 2012, Husteel provided the CONNUM-specific
conversion factors that Commerce used for the Final Results and that Wheatland contests in this
action.  *Final Decision Mem.* 34, 37; *Husteel's Second Supplemental Questionnaire Resp.* 1-2
(Nov. 16, 2012) (Public Admin.R.Doc. No. 129).

the comparison of Husteel's sales and cost data on a comparable basis," *id*. at 35, Commerce

found that "the revised conversion factors reflect a more appropriate and accurate methodology

for converting the per-actual weight costs to per-theoretical weight costs," *id*. at 37.

Before Commerce, Wheatland argued, *inter alia*, that Husteel's weighted-average

conversion factor for matching CONNUMs is significantly lower that the weighted-average

conversion factor for all CONNUMs, that "the only reason why certain CONNUMs have lower

conversion factors is because they are matching CONNUMs," and that, therefore, "Husteel's

proposed conversion factors represent an attempt" by Husteel "to manipulate its dumping

margin." *Final Decision Mem*. 33.  Wheatland advances essentially the same argument before

the court.  *See* Wheatland's Br. 7-8.  In doing so, Wheatland contests the Department's ultimate

decision to adopt Husteel's revised conversion factors without demonstrating that any of the

specific factual findings upon which Commerce reached that decision were unsupported by

substantial evidence.  Rather than attempt to do so, Wheatland grounds its argument on a

contention that during the review "Commerce failed to address Wheatland's argument" and that

this failure "was not based on substantial evidence and not in accordance with law."  *Id*. at 9.

This contention is unfounded.  Commerce addressed, and rejected, Wheatland's "manipulation"

argument by finding that the actual and theoretical pipe weights reported by Husteel to

Commerce were "consistently determined for all products," were "consistently applied in

allocating costs to products," and "were taken directly from Husteel's normal production and

cost accounting records." *Final Decision Mem*. 36.  Commerce proceeded from these findings to

conclude that the record evidence failed to support a finding that either the actual weights

reported by Husteel or the company's normal books and records were manipulated in order to

shift costs between products.  *Id*.  Commerce did not take issue with Wheatland's contention that

Husteel's weighted-average conversion factor for matching CONNUMs was significantly lower

that the weighted-average conversion factor for all CONNUMs, but it concluded, based on

specific and supported findings, that this contention alone was insufficient to establish that

Husteel either misreported data in its business records or designed conversion factors to

manipulate its margin.  The court finds no flaw in the Department's reasoning.

Wheatland next complains that Commerce "misstated Wheatland's argument" that

"Commerce should have rejected reported actual weights altogether and relied instead on

'*theoretical weight* as the actual weight.'"  Wheatland's Br. 8 (emphasis in original) (citation

omitted).  Wheatland takes issue with the Department's statement in the Decision Memorandum

that "Wheatland's suggestion to disregard the conversion factors since they are based on

unreliable actual weights fails to address the fact that the per-unit costs reported to the

Department which Wheatland requests that the Department rely on unadjusted were also based

on these same actual weights."  *Id*. (citing *Final Decision Mem*. 38).  Wheatland's argument is

misguided.  The salient point is that Commerce found ample reason to employ Husteel's revised

conversion factors, noting correctly that "the quantities and per-unit figures reported in the sales

files are on a different basis of measurement than the quantities and per-unit figures reported in

the cost file" and concluding that comparison of the unadjusted weights "would not provide for a

meaningful or accurate analysis."  *Final Decision Mem*. 35.  Having rejected Wheatland's

contentions that the conversion factors were unreliable and an attempt by Husteel to manipulate

the dumping margin, Commerce reasonably declined to accept Wheatland's argument that it

should employ a method that did not involve a conversion of sales data and cost data to the same

unit of measurement for product weight.

### III. CONCLUSION

The court will affirm the Final Results and the Department's decision not to amend those results in response to Husteel's ministerial error comments.  Judgment will enter accordingly.


/s/Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Date:   June 23, 2015
      New York, NY